UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| Dawn K., | ) | |
| | ) | |
| _Plaintiff_, | ) | |
| | ) | |
| v. | ) | No. 19 CV 50100 |
| | ) | Magistrate Judge Lisa A. Jensen |
| Andrew Marshall Saul, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| _Defendant_. | ) | |

**MEMORANDUM OPINION AND ORDER[1]**

Plaintiff Dawn K., who is now 46 years old, worked for 15 years in a data entry job until she was terminated in August 2015. In May 2016, she filed for Title II disability benefits based on pain and numbness in her right arm, left leg, knees, shoulders, and back. She had other conditions, including diabetes, high blood pressure, depression, plantar fasciitis, and obesity, but the orthopedic problems are her main impediments to working. At the forefront of this appeal is her problem with her right hand, wrist, forearm, elbow, and upper extremity, which will be referred to collectively as the "right arm" problem.

The administrative law judge ("ALJ"), after holding a hearing at which an impartial medical expert (Dr. Sai Nimmagadda) testified, found that Plaintiff had the residual functional capacity ("RFC") to do sedentary work. The RFC included three restrictions to accommodate the right arm problem, one of which limited her to frequent handling, fingering, and feeling. In fashioning the RFC, the ALJ relied heavily on Dr. Nimmagadda's testimony. Plaintiff argues that the ALJ failed to consider several important lines of evidence, thereby creating a false picture of

---

[1] The parties have consented to the jurisdiction of a United States Magistrate Judge for all proceedings pursuant to 28 U.S.C. § 636(c).

improvement and stability. In their briefs, the parties go back and forth over the weight of the objective evidence. Although some questions remain about how this evidence should be interpreted, the Court's primary reason for remanding the case is the ALJ's credibility analysis which relied too heavily on character-doubting inconsistencies.

## DISCUSSION

Plaintiff's arguments for a remand center on the right arm problem, and this Court will mainly discuss that impairment, keeping in mind that the ALJ on remand should address all the impairments. Plaintiff's first argument is that the ALJ ignored (or downplayed) multiple lines of evidence. The main one is that she had four surgeries to try and correct this problem. The first was in 2013, the second in December 2014, the third in September 2015, and the last one in October 2016.[2] Plaintiff contends that her pain and numbness remained and even worsened after these surgeries. The doctor who performed the last surgery, Dr. Korcek, told her these problems were likely permanent and not much more could be done. According to Plaintiff, the ALJ did not "go into the details" about this surgical history. Dkt. #13 at 5.  By failing to do so, the ALJ wrongly believed the right arm problems were "isolated, resolved, and/or benign." *Id.* This is Plaintiff's argument.

The Court agrees that Plaintiff has raised some valid criticisms. The ALJ only mentioned the last of these four surgeries, referring to it as the "most recent" and the "only surgery during the relevant period." R. 88. It is not clear what the ALJ meant by the latter phrase, although it suggests that the ALJ was aware that there was at least one previous surgery. But the ALJ did not explain why the earlier surgeries were not mentioned. If by "relevant period" the ALJ meant those taking place after the onset date, then the ALJ should have included the third surgery,

---

[2] In her reply brief, Plaintiff provides a recap of the medical details for each surgery. *See* Dkt. #17 at 2-3.

which occurred after the onset date. But the ALJ should have also considered all the surgeries because they related to cumulative treatment over the period from 2013 to 2016. These were not decades old surgeries. The ALJ was undoubtedly aware of the four surgeries because they were discussed at two points during the hearing. *See* R. 22, 27. In sum, the Court agrees that this surgical history was a relevant line of evidence and therefore should have been considered more fully. The failure to do so provides a possible basis for remand.

At the same time, the Commissioner raises some reasonable counterarguments. The ALJ relied heavily on Dr. Nimmagadda who had reviewed the entire medical record. It seems highly unlikely that he was unaware of this history. And, if Plaintiff's counsel believed Dr. Nimmagadda had failed to consider this history, counsel had the opportunity to bring it to his attention through cross-examination. However, counsel asked no such questions, thus weakening this line of argument. One possible reason the ALJ and Dr. Nimmagadda may not have chosen to dwell on this history is that they may have believed it did not shed any light on Plaintiff's *current* condition. Neither the ALJ nor Dr. Nimmagadda took the position that the right arm problems were non-existent or benign or *not* permanent, as Plaintiff suggests. The inclusion of the several RFC limitations geared toward this problem suggests they believed at least *some* part of the problem was permanent. To be clear, the Court agrees that the ALJ's decision would have benefitted from a more direct acknowledgment of this surgical history, but it is a close call as to whether the failure to describe this evidence in greater detail is, by itself, a reason to remand under the general doctrine that ALJs may not ignore an entire line of evidence. Because this Court is remanding for other issues set forth below it need not decide this issue.

Plaintiff raises other arguments about the ALJ's handling of the objective medical evidence. Plaintiff argues that the ALJ misconstrued the March 2017 EMG to suggest that the

nerve damage had been resolved. Plaintiff criticizes the ALJ's reliance on examination findings that Plaintiff had strength and stability and a normal range of motion in her right arm. Plaintiff argues that these findings were not necessarily dispositive about nerve damage. *See, e.g.*, Dkt. #13 at 7 ("Plaintiff has nerve damage and thus her limitations are likely from the nerve damage and unrelated to the physical make up of her muscle structure."). The Commissioner responds by again turning the focus back to Dr. Nimmagadda who referred to some of the objective evidence to justify his opinions. For example, he noted that Plaintiff's grip and pinch strength were almost as strong in the right hand as the left hand. R. 41. Plaintiff responds by arguing that the ALJ relied on additional evidence not cited by Dr. Nimmagadda and thereby played doctor.

Although each side presents reasonable arguments about the objective evidence, the Court finds that these arguments ultimately end up in what is basically a stalemate. Or to use a different metaphor, neither side can score a knockout by relying solely on the objective evidence. The ALJ and Dr. Nimmagadda both agreed that, under the first step of the two-step analysis, there was enough objective evidence to establish that Plaintiff's impairments "could reasonably be expected to cause [her] alleged symptoms." R. 89. This conclusion then moves the analysis to the second step which considers Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms." *Id.* (The ALJ found Plaintiff's statements "not entirely consistent.") This second step is the credibility analysis where the inquiry broadens beyond the objective evidence and considers other factors such as Plaintiff's statements and activities. With regard to these latter questions, which go to the subjective nature of Plaintiff's pain and limitations, Dr. Nimmagadda stated several times at the hearing that, basically, he could not offer a definitive opinion. *See* R. 42 ("it depends upon pain tolerance and other factors"); R. 43 ("Again, the pain, tingling, numbness, the other factors may—it's hard to quantify that so I

4

didn't see that reported in the record, but it may exist with her—with her tolerance of pain and—discomfort.").

In sum, all of the above arguments about the meaning and weight of the objective evidence eventually lead to the credibility analysis. In this Court's view, this is the critical portion of the decision. Plaintiff did not directly attack this analysis in her opening brief, but the Commissioner's response brief relied on it to defend the ALJ's decision, which in turn prompted Plaintiff to advance her own criticisms.

The Court will begin by looking at the three rationales the ALJ cited for not finding Plaintiff credible. Set forth below is the entire analysis (with labels inserted by the Court to identify the rationales):

> **[Rationale #1]** There are some inconsistencies between the claimant's alleged exertional functioning capabilities and her activities of daily living. Despite alleging she is only capable of sitting and standing for five minutes at a time, the claimant also stated she prepares breakfast for her son and takes him to school. After this, she either returns home or goes to the grocery store. In the afternoon, the claimant picks her son up and goes home for dinner. At home, the claimant testified she is able to do laundry, cook, and wash the dishes with breaks. More specifically, the claimant testified that she can clean for 10 minutes before taking a break (9E/2 and Hearing Testimony).
>
> **[Rationale #2]** There are also inconsistencies with the claimant's medical evidence. Although the claimant testified to side effects from taking Cymbalta, September 2016 and 2017 progress notes revealed the claimant took medications as directed without any side effects (12F/3, 6, 8, 13). **[Rationale #3]** Finally, despite allegations of constant pain and tingling sensations, the July 2016 consultative examiner noted the claimant's power was 5/5 with normal muscle tone and muscle mass in all four extremities. Further, the claimant had a right hand grip of 5/5 bilaterally and the claimant exhibited normal muscle tone (6F/3 and 11F/6). In addition, a more recent x-ray of the shoulder in January 2018 revealed only mild degenerative changes, and the claimant's strength was 5/5 (17F/2).

R. 89-90.

We can take Rationale #3 off the table right at the outset for the reasons already discussed. Both the case law and agency regulations make clear that, although objective evidence

can be a "useful indicator" in assessing the claimant's credibility, ALJs "will not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms *solely because* the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual." SSR 16-3p (emphasis added); *Hall v. Colvin*, 778 F.3d 688, 691 (7th Cir. 2015) ("an administrative law judge may not deny benefits on the sole ground that there is no diagnostic evidence of pain"); *Adaire v. Colvin*, 778 F.3d 685, (7th Cir. 2015) ("[The ALJ's] principal error, which alone would compel reversal, was the recurrent error made by the Social Security Administration's administrative law judges, and noted in many of our cases, of discounting pain testimony that can't be attributed to 'objective' injuries or illnesses—the kind of injuries and illnesses revealed by x-rays.").

In short, this law makes clear that there must be additional valid rationales. This leaves two rationales to be examined. However, both are insufficient.

**Rationale #1 – Activities of Daily Living.** The ALJ thought Plaintiff was inconsistent when she testified that she could sit or stand "for five minutes at a time" (the ALJ's summary), but then testified that she could do certain household tasks (*e.g.* preparing breakfast for her son, doing laundry, cooking, etc.). This rationale is problematic in several respects.

First, it is not clear that these two statements are contradictory. It is possible that they are, but more facts are needed to justify the conclusion. As Plaintiff argues, it is not clear why she could not simply do the activities in question in 5-minute chunks, perhaps alternating between sitting and standing. Consider her making breakfast for her son. It is possible she merely served him a bowl of cereal or a pop tart. On her daily function report, she stated that she only made "simple meals." R. 260. As for the other activities, such as laundry, she stated that she took breaks. *Id.* It is possible that she was able to flexibly schedule these activities by working in

6

spurts. *See Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012); *Hamilton v. Colvin*, 525 Fed.

App'x. 433, 438 (7th Cir. 2013) ("We have admonished ALJs to appreciate that, unlike full-time

work, the 'activities of daily living' can be flexibly scheduled").[3]

       Second, the ALJ seized upon one portion of Plaintiff's testimony and failed to consider

all her statements in a holistic and fair manner. To quote the particular portion the ALJ relied on,

Plaintiff stated that she could stand for "[a]bout five to seven minutes" at a time and could sit for

"about five minutes" before she would have to "adjust the way [she was] sitting or stand up." R.

27. The ALJ reduced this testimony to an unqualified ironclad five-minute limit. But this leaves

out the qualifications—for example, that she might be able to sit longer than five minutes by

simply adjusting her position while still remaining sitting.[4] But another concern is that the ALJ

also made no effort to integrate this testimony with Plaintiff's other statements. Plaintiff gave

slightly different time estimates in various places. For example, she testified that she could

probably drive for a half hour before she would have difficulties. R. 19. Several questions at the

hearing assumed she could do these tasks for 10 minutes. *See, e.g.*, R. 35 ("So when you said you

have to take breaks every 10 minutes when you're doing household chores, what symptoms

specifically are causing you to have to do that?"). In her Daily Function Report, she wrote:

"sitting standing & walking for 20 min max." R. 263. So there were a series of time estimates—5

minutes, 10 minutes, 20 minutes, and so on. Perhaps this variation is evidence of dissembling, as

the ALJ suggested, but it could also be simply the natural variation resulting when a person

---

[3] In addition, Plaintiff indicated she was often hurting and tired after doing these activities causing her, for
example, to sleep after taking her son to school and doing a "few" household chores. R. 259. The ALJ did
not address this issue either. *See, e.g. Reinaas v. Saul*, 953 F.3d 461, 467 (7th Cir. 2020) (remanding:
"the ALJ cited Reinaas's ability to use a chainsaw, mow the lawn, and care for his child but ignored his
testimony about the pain and fatigue these activities cause him and his limitations with them.").
[4] Plaintiff's testimony is a little ambiguous about the role adjusting her position played in extending the
length of her sitting time.

makes multiple rough estimates of this kind, some made in writing and some given orally, some made years apart.[5] The ALJ's finding rested on a five-minute discrepancy. The concern is that the ALJ unfairly hovered over Plaintiff's statements scrutinizing them with the exactitude of a track coach holding a stopwatch. Although the time increments are small, the stakes are large because the ALJ used this inconsistency, and the one discussed next, to draw deeper conclusions.

**Rationale #2—Medication Side Effects.** This rationale is weaker than the first one. The ALJ insinuated that Plaintiff lied when she testified that she had side effects from taking Cymbalta. According to the ALJ, this testimony was dubious because the ALJ found four instances in the record (specifically, 12F at 3, 6, 8, 13) where Plaintiff reported to one of her doctors that she was not then experiencing any side effects.

As a preliminary point, the issue of medication side effects was not an important part of this case by anyone's estimation. Plaintiff never offered it as a material part of her argument. Her counsel did not mention it in the pre-hearing letter brief. In response to the general "why can't you work" question, Plaintiff also did not mention it.

Turning to the testimony relied on by the ALJ, Plaintiff was asked whether she had any side effects from any medications. She answered: "Some of them like the Cymbalta sometimes makes me a little drowsy." R. 24. The ALJ summarized this testimony as follows: "As for her medication, the claimant takes Cymbalta for her right hand pain. However, she also noted that the Cymbalta causes her to feel drowsy." R. 88; *see also* R. 89. The ALJ's summary omitted two qualifying words—"sometimes" and "little." Although the omission of just two words might seem immaterial, these two words are important because they suggest Plaintiff did not view this side effect as being either significant or constant. Given this fact, it would not be surprising if she

---

[5] The daily function report was completed on August 15, 2016; the hearing took place on January 24, 2018.

did not mention this problem to her doctors. The Seventh Circuit has made similar observations. *See, e.g., Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) ("To begin with, we are skeptical that a claimant's failure to identify side effects undermines her credibility—after all, not everyone experiences side effects from a given medication, and some patients may not complain because the benefits of a particular drug outweigh its side effects.").

Another problem with this rationale is cherrypicking. To prove that Plaintiff never complained about drowsiness from taking Cymbalta, the ALJ cited to four places in the record. They all came from Exhibit 12F. Reliance on this one particular exhibit is somewhat surprising in that it contains treatment notes for more minor conditions *unrelated* to the orthopedic problems. *See, e.g.*, R. 687 (sore throat); R. 689 (hypertension recheck); R. 691 (diabetes medication recheck). And Plaintiff told this particular doctor (Dr. Boparai) that she was seeing a pain management doctor "for her chronic pain issues." R. 691. Thus, it is possible that when Plaintiff stated to Dr. Boparai that she was not experiencing any side effects from her medications, she was referring only to those medications this doctor was prescribing.

Although the ALJ chose to rely on these examples from Exhibit 12F, the ALJ did not consider other statements about medication side effects from other exhibits. In particular, Exhibit 11F contains notes from Plaintiff's visits to Dr. Ishmeet Singh, a pain management doctor Plaintiff saw in the latter half of 2017. We will discuss Dr. Singh more below, but in terms of medication side effects, it is noteworthy that his notes indicate that Plaintiff complained about drowsiness during at least one visit. *See* R. 679 (noting that Plaintiff "had to decrease gabapentin to 300mg @ bed because she was so drowsy during the day and has a 4 year old to care for"). It is true that this drowsiness related to Gabapentin and not Cymbalta. But the ALJ still should have mentioned this contrary evidence. For one thing, when Plaintiff testified that she

"sometimes" was drowsy from her medications, she may have been mistaken about which medication was the cause. For another thing, the ALJ made the broader statement that the "record does not reveal other medication changes due to drowsiness." R. 89. This statement is inaccurate in light of Dr. Singh's treatment notes. In sum, this second rationale does not provide a valid basis for discounting Plaintiff's credibility.

In addition to these questions about the factual basis for Rationales #1 and #2, there is a broader concern that the ALJ used these two alleged inconsistencies to unfairly draw more prejudicial conclusions about Plaintiff's overall honesty. The ALJ stated the following:

> Although the inconsistent information provided by the claimant may not be the result of a conscious intention to mislead, nevertheless the inconsistencies suggest that the information provided by the claimant *generally* may not be entirely credible.

R. 91 (emphasis added); *see also* R. 88. This statement does not explicitly use the word malingering, but this accusation is latent despite the ALJ's attempt to soften it with the caveat that Plaintiff's deception could have been done in a "non-conscious" way (whatever that means). The Court's concern is that the statement seems to violate this admonition in SSR 16-3p:

> Adjudicators must limit their evaluation to the individual's statements about his or her symptoms and the evidence in the record that is relevant to the individual's impairments. In evaluating an individual's symptoms, our adjudicators will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation. The focus on the valuation of an individual's symptoms should not be to determine whether he or she is a truthful person.

Going back to the two alleged inconsistencies, the ALJ could have taken them into account (assuming they were properly factually supported) by limiting them to the issue at hand. For example, if the ALJ believed that Plaintiff's testimony about sitting or standing for only five minutes was exaggerated, when the ALJ believed she could actually sit for ten minutes or even longer, then the ALJ could have adopted those longer timeframes when fashioning the RFC.

Stated differently, the alleged inconsistency between, say, sitting for "about" five minutes and sitting for 20 minutes "max" does not seem to be the type of egregious inconsistency warranting an across-the-board rejection of Plaintiff's testimony.

In sum, the Court finds that the ALJ's three stated rationales are not adequate on their own terms. But the credibility analysis is also insufficient because it fails specifically to consider the credibility factors set forth in the regulations. They are the following:

1. Daily activities;

2. The location, duration, frequency, and intensity of pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

SSR 16-3p; 20 C.F.R. § 404.1529(c)(3). The ALJ never acknowledged these factors. To its credit, the Commissioner in its response brief attempts to retrofit the ALJ's rationales back into this framework. *See* Dkt. # at 4-6. But the mere fact that the Commissioner is attempting such an after the fact reconfiguration highlights the weakness of the ALJ's approach.

One topic these factors refer to is treatment. Although there are a few statements sprinkled throughout the ALJ's decision hinting at her views on this topic, the Court is still not clear on how she addressed it. The Commissioner suggests that the ALJ was relying on a conservative treatment rationale. But the ALJ never explicitly adopted this rationale. The

ambiguity about where exactly the ALJ stood on this issue makes it difficult to conduct a meaningful review now.

But if we were to assume that the ALJ relied on a conservative treatment rationale, important questions would still remain. This brings us back full circle to the four-surgeries argument. Putting aside how successful these four surgeries were, there is the basic fact that Plaintiff was willing to undergo this many surgeries, thus arguably lending credence to her subjective allegations. *See* SSR 16-3p ("Persistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent"). At the hearing, the ALJ asked Plaintiff what kind of treatment she was receiving for the arm, and she answered: "Just medication is all I'm able to do. I was told it's permanent so they had me on Cymbalta and Mobic for it, but I don't notice any difference." R. 23. Dr. Nimmagadda never testified about treatments, either those already undertaken or those that might be tried in the future. *See Wenzel v. Colvin*, No. 2:13-CV-433-JEM, 2015 WL 880581, at *7 (N.D. Ind. Feb. 27, 2015) ("The ALJ may consider conservative treatment in assessing the severity of a condition, but should cite medical evidence about what kind of treatment would be appropriate.") (internal quotation marks and citation omitted). To the extent the ALJ was relying on a conservative treatment rationale, it is important to know whether more aggressive treatments were available. *See Howard v. Berryhill*, No. 17 C 583, 2018 WL 6529284, at *10 (N.D. Ill. Dec. 12, 2018) ("A claimant does not have to undergo the most extreme form of treatment in order for her testimony to be accepted"); *Pratt v. Colvin*, No. 12 C 8983, 2014 WL 1612857, at *7 (N.D. Ill. Apr. 16, 2014) (finding it improper to discount claimant's credibility based on a lack of an attempt to seek

12

certain treatment where there is no evidence that such treatment was recommended or would have been effective). On remand, this topic should be explored.

As for medications, the ALJ brushed by this topic. The ALJ noted the medications Plaintiff was taking as of the last medical visit before the hearing. *See* R. 89 ("The claimant's most recent medications list in January 2018 included Metformin, Metoprolol, Losartan, Cymbalta, Mobic, Biotin, and Ambien[.]"). The ALJ also noted specifically that Plaintiff "takes Cymbalta" for the right arm pain. R. 88. But the ALJ failed to acknowledge that Plaintiff had tried other medications, including Gabapentin as noted above, and that she and her doctors had changed dosages trying to find the right balance. *See* SSR 16-3p (noting the relevance of "increasing dosages and changing medications").

Another overlooked topic is the use of specialists. Specifically, Plaintiff saw Dr. Singh, a pain management specialist, to address the issue of right arm pain. There were four visits in 2017—May 16th, August 16th, September 13th, and October 18th. R. 676, 678, 681, 683.[6] Plaintiff testified at the hearing that she was then seeing a pain management specialist, and confirmed that it was Dr. Singh. R. 28. In assessing treatment for purposes of credibility, both SSR 16-3p and the case law indicate that seeking special pain treatment tends to bolster the claimant's credibility. *See, e.g.*, *Lambert v. Berryhill*, 896 F.3d 768, 774 (7th Cir. 2018) ("Indeed, throughout Lambert's treatment history, medical imaging ruled out specific, objective causes of his ongoing pain—yet his doctors performed surgeries, prescribed powerful pain medications, and recommended long-term pain-management techniques for his suite of chronic back problems."). Yet, surprisingly, the ALJ never mentioned Dr. Singh by name nor referred to the fact, even in a generic way, that Plaintiff had been seeing a pain a management specialist.

---

[6] A follow-up visit was to take place three months after this last visit, which would have put it roughly around the time of the hearing in January 2018.

The absence of any reference to Plaintiff's treatment with Dr. Singh raises the possibility that the ALJ did not see Exhibit 11, which contains his treatment notes. However, this possibility is foreclosed because the ALJ did cite to Exhibit 11F in a few instances, such as the following: "the claimant had a right hand grip of 5/5 bilaterally and the claimant exhibited normal muscle tone (6F/3 and 11F/6)." R. 89. This reference demonstrates that the ALJ was aware of these treatment records and culled through them for facts helpful to the ALJ's thesis. But the ALJ should have discussed all this evidence rather than cherrypicking a few isolated findings.

As for the reliance on Dr. Singh's finding of "normal muscle tone," this isolated observation means little without considering the larger treatment relationship and, in particular, whether the doctor believed this particular finding was material. In this case, despite making certain normal findings upon examination, Dr. Singh went on to prescribe pain medications (*e.g.* Gabapentin) and to diagnose Plaintiff with chronic pain syndrome. R. 680. Again, because the ALJ chose to simply excise Dr. Singh from the decision, we cannot tell whether these points were considered.

In remanding the case, the Court is not indicating that the ALJ must rule a particular way on these questions, but they should be explored more fully and done so with the assistance of a medical expert.

## CONCLUSION

For these reasons, Plaintiff's motion for summary judgment is granted, the Commissioner's motion is denied, and the case is reversed and remanded to the Commissioner for further proceedings consistent with this Opinion.

Date: June 16, 2020

By: _Lisa A. Jensen_
Lisa A. Jensen
United States Magistrate Judge

14